# THE STATE OF NEVADA, Appellant, v. HARRY A. BUSSCHER, Respondent.

No. 4866

November 12, 1965                    407 P.2d 715

[Rehearing denied December 20, 1965]

*Harvey Dickerson*, Attorney General, Carson City; *William J. Raggio*, District Attorney, and *Herbert F. Ahlswede*, Chief Criminal Deputy, of Reno, for Appellant.

*Bradley & Drendel*, of Reno, for Respondent.

## OPINION

By the Court, THOMPSON, J.:

A jury found Busscher guilty of suborning perjury. In accordance with NRS 175.540 he applied for a new trial, before judgment was entered and sentence pronounced. The district court granted his motion, stating that "the evidence shows the defense of entrapment to have been affirmatively and positively proved." We take that language to mean that entrapment was established as a matter of law. For the reasons hereafter expressed, we hold that the record shows, as a matter of law, that the defense of entrapment was not established. Accordingly, we reverse the order for a new trial and reinstate the jury verdict.

1. The grounds for another trial of a criminal case are designated by NRS 175.535. Here the defendant Busscher sought a new trial under subdivision 6 of that statute—"when the verdict is contrary to law or evidence." Whenever a new trial is granted upon that ground, our initial task is to ascertain precisely what the lower court had in mind; whether it ruled as it did because the verdict was "contrary to law," or whether it believed that the verdict was "contrary to evidence." A ruling based upon the ground that the verdict is contrary to law presents a question of law that is within our jurisdiction to review. On the other hand, an order for another trial made because the verdict is contrary to evidence involves an evaluation of the evidence, its weight, the credibility of witnessess and the like, and effectively precludes our intervention on appeal. We are constitutionally precluded from overturning the order for another trial when this ground is

the basis of the trial court's ruling. Nev. Const., art. 6, § 4.

Historically, Nevada has empowered the trial court in a criminal case where the evidence of guilt is conflicting, to independently evaluate the evidence and order another trial if it does not agree with the jury's conclusion that the defendant has been proven guilty beyond a reasonable doubt. State v. Van Winkle, 6 Nev. 340; State v. Jones, 7 Nev. 408; State v. Mills, 12 Nev. 403; State v. Bauer, 34 Nev. 305, 122 P. 76. In this limited situation, the jury and the court must be convinced of the defendant's guilt. If the court is not convinced, it may protect the defendant to the extent of authorizing another trial before another jury. It is apparent that, when another trial is ordered for the reason that the verdict is contrary to evidence, the decisional process necessarily involves a resolution of conflicting issues of fact—the trial court has simply preferred its evaluation of the conflicting evidence to that of the jury—and we may not, in such case, touch the trial court's ruling. This, among other matters, is what the writers of our Constitution had in mind when they limited our appellate jurisdiction in criminal cases to "questions of law alone."

The opposite is true when the reason for another trial is that the verdict is contrary to law. In general terms, this means that the evidence presented is insufficient as a matter of law to sustain a verdict of guilty. This ground normally is not available when the evidence is in conflict as to material facts. Where, however, the evidence is uncontroverted, the lower court in considering a motion for new trial, and this court on review, may decide whether such uncontroverted evidence, as a matter of law, does or does not show the commission of a crime. In this instance, the process of weighing evidence and resolving disputed questions of fact is not involved.

The record of this case does not present a conflict in the evidence. What occurred is not denied. The defendant Busscher chose not to testify, nor was any evidence

offered on his behalf. In ordering a new trial, the lower court made clear its view that a crime had not been committed because entrapment was established as a matter of law. Whether that court was correct in so ruling, presents a question of law within our jurisdiction to review.

2. The law of entrapment has been carefully defined in Nevada by a series of decisions. In re Davidson, 64 Nev. 514, 186 P.2d 354; In re Wright, 68 Nev. 324, 232 P.2d 398; Wyatt v. State, 77 Nev. 490, 367 P.2d 104; Adams v. State, 81 Nev. 524, 407 P.2d 169. It is permissible to employ a decoy who, for the purpose of detecting a public offense, furnishes an opportunity for the commission of crime by one possessing the requisite criminal intent. In re Wright supra; Wyatt v. State, supra. Thus, if the criminal intent originates in the mind of the defendant, without urging or persuasion by the decoy, entrapment does not exist. Sorrels v. United States, 287 U.S. 435, relied upon by Busscher, does not suggest a different rule. Each case necessarily involves a close analysis of the evidence.

We have carefully studied the record here. As noted, the defendant Busscher did not testify, and all relevant evidence offered by the state stands unrefuted. As we see it, entrapment was not established as a matter of law. Indeed, had an instruction on that doctrine been refused, we could not find error. Wyatt v. State, supra. All of the evidence shows that an employed decoy supplied an opportunity to Busscher to suborn perjury, and that Busscher willingly and intentionally did so.

The Washoe County District Attorney's office, prompted by information from the United States Department of Immigration, employed Ben Wood to contact Busscher, pretending that he (Wood) wished to obtain a Nevada divorce. Wood was a police officer of Oakland, California. Before departing for Reno, and with the consent of the bank manager, Wood opened a checking account with a branch of the Bank of America at Oakland, using the fictitious name of Ben Askew.

He also arranged covering employment with a department store of that city. On the morning of January 8, 1964, Wood, identifying himself as Ben Askew, telephoned Busscher's office for an appointment and was told by the secretary to come in at 11:00 a.m. He did so, and shortly thereafter was introduced to Busscher. He advised Busscher that he wanted a divorce, and that Busscher had been recommended to him by several people in Oakland. The usual matters were discussed. As to the legal residence requirement the record shows: Wood: "(A.) He asked was I familiar with the rules and regulations pertaining to divorce in the State of Nevada, and I told him no, I wasn't too clear about it at all, I needed information from him as to just what the procedure would be. Q. All right, then what did he say? A. Well, he said that it would require six weeks residence, and I said, 'Oh, gosh. Well,' I said, 'I don't know how in the world I am going to work that out. I can't get away from the job long enough.' And he replied that, 'Well, we will take care of that later.' " During that office conference Busscher quoted the cost for the divorce to be approximately $247. Wood gave him a check for $50 on account. Before leaving, the matter of residence was again discussed, Wood once more stating that he did not know how he could stay in Nevada six weeks. To this, Busscher replied that it "could be worked out, he was going to give me a name and address of a person to see and I was to contact this person. Whatever conversation that person and I had was strictly—would be between me and that person. He said he didn't want to know anything about it, but after I made the contact with this person I was to call him back and let him know if the contact had been made; and he then proceeded to write on the back of a card the name of the person I was to contact and the address." Busscher then advised the decoy that he would have to be back for a court appearance on February 20, and wrote that date on a card and gave it to him.

Wood then left Busschers's office and tried to locate Kiah Lumpkins, whose name and address Busscher had written on the card. He could not be found. About 4:30

p.m. Wood telephoned Busscher's office and advised Busscher that he was not able to find Kiah Lumpkins and that he (Wood) had to leave town that evening. Busscher said, "Well, try another location," and gave Wood the location of Henry's Hickory Pit at the corner of Lake Street and Commercial Row, suggesting that Wood ask for Henry Lumpkins, Kiah's brother, who would deal with Wood on the same basis. Busscher also asked Wood to call him back after he had contacted Henry Lumpkins.

Wood proceeded directly to Henry's Hickory Pit. A man rose from his chair, approached Wood, and introduced himself as Henry Lumpkins. During their conversation Wood did not ask Lumpkins to be his resident witness in the divorce case to be filed, nor did he suggest that false testimony be offered by Lumpkins. Following this meeting, Wood telephoned Busscher, advising that contact had been made with Henry Lumpkins. Busscher told Wood to be in Reno on the morning of February 20.

Wood returned to Oakland, California. On or about February 18 he wrote Busscher from Oakland, advising that he could not get off work on February 20, and inquired if February 24 would be suitable. On February 20 he telephoned Busscher from Oakland, asked if Busscher had received his letter, and was informed by Busscher that he had. February 24 was tentatively agreed upon as the day for going to court. On February 24 Wood again telephoned Busscher from Oakland and asked a postponement as he could not obtain his employer's permission to be away on that day. The date of February 28 was then selected.

On February 27 Wood came to Reno. He conferred with the investigative staff of the district attorney's office. He had kept them continually advised throughout. On the morning of February 28 he went to Busscher's office. The relevant part of Wood's undenied testimony about his conference with Busscher that morning follows: "Q. All right, after the defendant came into the office, what then happened? A. Another two or three minutes passed and then I was told to—Attorney Busscher was ready to see me, and I proceeded back

to his office, and after entering his office I stated the point, and he stated, 'Good morning,' and he then asked me where was my resident witness, and I replied that I didn't know, and he appeared angry, and I stated that I didn't know what I was supposed to do, I was a little confused, and he says, 'You are supposed to have a resident witness, someone who has seen you every day,' and he says, 'Who is your resident witness?' And I replied, 'Well, Mr Lumpkins.' And he says, 'Why isn't he here?' I said, 'Well, I don't know, I mean, what should I do, should I try to call him from here or just what should I do?' And he replied that he would have his secretary get him on the phone. So he picked up his phone and told the secretary, says, 'Get Henry on the phone,' and with that he placed the receiver back. And then he replied that he was very angry because of my behavior in the matter, because it appeared as though I was trying to get him disbarred. He said I had called him from down there, and he—I hadn't followed instructions, or something to that effect, and I was overlooking the fact that he was just trying to do me a favor.

"And by this time I believe the phone rang, the buzzer rang, and he picked up the phone and apparently the secretary had made the connection because he referred to Henry, and said that Ben Askew was going today, 'Can you be down here? We have to go at 9:30.' And then he hung up the phone. And then he replied to me that Henry had worked all night and had gotten in bed at 5:30, and it would be a little difficult for him to make a real hasty appearance but he would be there in time for us to appear in court, and his next move was to say, 'Well, I see you have signed the papers, I guess I better get these papers together,' and then with that he pulled out the papers, and he proceeded to write something on the papers. Then he stated that he was going to go through the testimony, we may as well get that straightened out right now, * * *. He stated that we had very little time, and therefore we'd go through the testimony once, and I better get it and picked up on it the first time, and so he proceeded to ask questions. He says, 'Where do you live?' And I stated, '1310 Burnett Street, Berkeley.' And he says, 'That would really do it.' He

said, 'They'd throw us right out of court, no divorce,' and he stated again, 'Where do you live?' And I faltered and—because I temporarily couldn't remember—and I says, 'I don't remember the address you gave me.' And he replied, '533 Second Street, Reno,' and then I repeated, '533 Second Street.' And he says, 'Now get that right.' And I said, 'Yes, sir.' And he said, 'How long have you resided in the state?' And I stated, 'From the 7th of January, '64, to the present time.' And then he asked about the reasons for the divorce, 'Why do you want a divorce?' "

Wood made out a check to Busscher for $197, the balance owing, took a receipt therefor, and left to meet Busscher at the courthouse a few minutes later.

The assistant district attorney had already alerted each judge of the Second Judicial District Court that he expected a divorce action, Askew v. Askew, to be filed by attorney Busscher, and that perjury might occur. He also notified Judge Barrett, in whose court the matter later came on for hearing, that he (the assistant district attorney) might request permission to approach the bench during the Askew trial. At 9:50 a.m., February 28, 1964, Askew v. Askew came on for hearing. Henry Lumpkins was sworn and testified as the resident witness for Ben Askew. He stated that he first met Askew on January 7, 1964, at Henry's Corner, Reno; that Askew resided at 533 East Second Street, Reno, from January 7, 1964, to "the present time" and that he had seen Askew every day. Following Lumpkins' testimony, Judge Barrett recessed court, and law officers arrested Lumpkins and Busscher on the spot. Busscher's file concerning the case was contemporaneously seized. Lumpkins was subsequently charged with perjury and Busscher with subornation of perjury.

It was the state's position below, and here, that Busscher arranged for and placed Henry Lumpkins on the witness stand, knowing that Lumpkins would give false testimony about the residence of Ben Askew (Wood), in violation of NRS 199.120. The state further argues that the record is barren of any evidence tending to show that the required intent to suborn perjury originated other than in the mind of Busscher. Our attention

is directed to the fact that Wood did not request Lumpkins to testify, nor did he request either Lumpkins or Busscher to arrange a fabricated residence. He merely offered to each of them an opportunity to do so, and each carried forward from there. The record supports the state's position.

Of course it is true that the scheme to afford Busscher an opportunity to commit crime was conceived and executed with care and was itself blemished by much deceit. However, this does not inure to Busscher's benefit. Deception may be permissible when done by one acting in good faith, with the purpose of detecting crime. In re Davidson, 64 Nev. 514, 186 P.2d 354. There is no suggestion of bad faith or unlawful purpose here.

For the reasons expressed, the order of the lower court granting a new trial is reversed, the jury verdict reinstated with direction to enter judgment thereon and pronounce sentence.

BADT, J., and BREEN, D. J., concur.